# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

JUAN GÓMEZ,
    *Plaintiff*,

    v.

DEPARTMENT OF CORRECTION *et al.*,
    *Defendants*.

No. 3:20-cv-958 (JAM)

## ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

Plaintiff Juan Gómez is a prisoner in the custody of the Connecticut Department of Correction ("DOC"). He filed this *pro se* and *in forma pauperis* action under 42 U.S.C. § 1983 principally alleging that prison officials retaliated against him, seriously injured him, denied him medical care, and transferred him to a restrictive facility in violation of his constitutional rights. I previously entered an initial review order dismissing some of his claims, *see Gómez v. Dep't of Corrections*, 2020 WL 6526108 (D. Conn. 2020), and the remaining defendants now move for summary judgment on the ground that Gómez failed to exhaust his administrative remedies as required under the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a). For the reasons set forth below, I will grant the defendants' motion.

## BACKGROUND

Gómez filed this action on July 10, 2020.[1] In his complaint, Gómez alleges that he and other inmates at Carl Robinson Correctional Institution ("Carl Robinson") complained in late March and early April 2020 to Warden Caron and other Carl Robinson officials about the poor conditions of their confinement.[2] Gómez and the other inmates were especially concerned that

---

[1] Doc. #1.
[2] *Id.* at 14–15 (¶¶ 7–8).

they were at risk of contracting COVID-19 from prison staff who failed to wear personal protective equipment ("PPE").[3] Over the following days, Warden Caron threatened Gómez that she would ensure he had a "hard stay" at Carl Robinson if he did not stay quiet about the PPE issue.[4] Gómez and the other inmates continued to press their concerns, including by contacting a local news outlet.[5]

Subsequently, on April 5, 2020, Correctional Officer Guertin called for back-up after getting into a verbal altercation with Gómez, and Lieutenant Ouellette, Lieutenant Kitt, and Correctional Officer Quiron then used or allowed others to use excessive force—including twisting of wrists and arms and using overtight handcuffs that caused injury—in removing Gómez from his cell at Carl Robinson.[6] Gómez was denied medical care for the injuries he sustained during his cell extraction.[7] That same day, Gómez was transferred to Northern Correctional Institution ("Northern"), where he was placed in isolated confinement.[8]

On initial review, I concluded that Gómez had sufficiently alleged that Warden Caron had retaliated against him after he complained about staff failure to wear PPE.[9] *See Gómez*, 2020 WL 6526108 at *3. I concluded further that Gómez had plausibly stated a claim for excessive force against the officers involved in the cell extraction of April 5, 2020.[10] *Id.* at *4. I therefore allowed Gómez to proceed with his First Amendment retaliation claim against Warden Caron in her individual capacity for money damages and with his Eighth Amendment excessive force claims against Officer Guertin, Officer Quiron, Lieutenant Ouellette, and Lieutenant Kitt in their

---

[3] *Ibid.*
[4] *Ibid.*
[5] *Id.* at 15, 19 (¶¶ 8, 22).
[6] *Id.* at 15–17 (¶¶ 9–15).
[7] *Id.* at 17, 19, 22 (¶¶ 16–18, 22, 31).
[8] *Id.* at 18 (¶¶ 19–20).
[9] Doc. #8 at 7.
[10] *Id.* at 8.

individual capacities for money damages.[11] *Id.* at *7. All other claims were dismissed without prejudice to Gómez filing an amended complaint by November 25, 2020.[12] *Ibid.* Gómez did not file an amended complaint.

On June 15, 2021, the remaining defendants moved for summary judgment on the ground that Gómez failed to exhaust his administrative remedies prior to filing this action.[13] The defendants supported their motion for summary judgment with a Local Rule 56(a)(1) Statement of Undisputed Material Facts as well as several evidentiary exhibits.[14] In response, Gómez submitted a Local Rule 56(a)(2) Statement of Facts in Opposition to Summary Judgment as well as several evidentiary exhibits of his own.[15]

## DISCUSSION

The principles governing my review of a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). I must view the facts in the light most favorable to the party who opposes the motion for summary judgment and then decide if those facts would be enough—if eventually proved at trial—to allow a reasonable jury to decide the case in favor of the opposing party. My role at summary judgment is not to judge the credibility of witnesses or to resolve close and contested issues but solely to decide if there are enough facts that remain in dispute to warrant a trial. *See generally Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014) (per curiam); *Benzemann v. Houslanger & Assocs., PLLC*, 924 F.3d 73, 78 (2d Cir. 2019).

---

[11] *Id.* at 15.
[12] *Ibid.*
[13] Doc. #25.
[14] Doc. #25-3.
[15] Doc. #29. Because Gómez did not submit any memorandum in opposition to the defendants' motion, I will construe Gómez's Rule 56(a)(2) statement and attachments as his complete opposition to the defendants' motion for summary judgment.

Because Gómez is a *pro se* party, his pleadings and submissions on summary judgment must be given a liberal construction. "The policy of liberally construing *pro se* submissions is driven by the understanding that implicit in the right to self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training." *McLeod v. Jewish Guild for the Blind*, 864 F.3d 154, 156–57 (2d Cir. 2017) (per curiam).

The Court's local rules ensure that a *pro se* party is thoroughly advised of the procedural requirements for opposing a summary judgment motion, *see* D. Conn. L. Civ. R. 56(b), and the defendants here have complied with the rule's requirement to serve on Gómez a notice detailing the rules that govern a motion for summary judgment.[16] A party's *pro se* status does not relieve the party of the obligation to respond to a motion for summary judgment and to support the party's claims with evidence as the rules require. *See Nguedi v. Fed. Reserve Bank of New York*, 813 F. App'x 616, 618 (2d Cir. 2020).

### Exhaustion of administrative remedies

The PLRA, 42 U.S.C. § 1997e(a), states that "[n]o action shall be brought with respect to prison conditions ... by a prisoner ... until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). This exhaustion requirement applies to all claims regarding "prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). Exhaustion of all available administrative remedies must occur regardless of whether the remedies can provide the relief that the prisoner seeks. *See Booth v. Churner*, 532 U.S. 731, 740–41 (2001). Furthermore, prisoners must comply with all procedural rules regarding the grievance

---

[16] Doc. #25-2.

process prior to commencing an action in federal court. *See Woodford v. Ngo*, 548 U.S. 81, 90–93 (2006).

Even if a prisoner has availed himself of the prison grievance process, the Second Circuit has held that a prisoner does not exhaust his administrative remedies unless his grievance "allege[s] facts sufficient to alert corrections officials to the nature of the claim." *Singh v. Lynch*, 460 F. App'x 45, 47 (2d Cir. 2012). Because the exhaustion requirement is intended to afford prison officials an opportunity to address the issue internally, *Porter*, 534 U.S. at 524–25, the inmate must include sufficient information to enable prison officials to address the same claim asserted in federal court.

Thus, as one court has recognized, "the mere fact that plaintiff filed *some* grievance, and fully appealed all the decisions on that grievance, does not automatically mean that he can now sue anyone who was in any way connected with events giving rise to that grievance." *Turner v. Goord*, 376 F. Supp. 2d 321, 324 (W.D.N.Y. 2005) (emphasis in original). Still, however, the grievance need not "lay out all the facts, articulate legal theories, or demand particular relief. All the grievance need do is object intelligibly to some asserted shortcoming." *Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir. 2004).

Importantly, a prisoner is required to exhaust only those administrative remedies that are "available." 42 U.S.C. § 1997e(a); *see Ross v. Blake*, 578 U.S. 632, 641 (2016). An administrative remedy is unavailable under three circumstances: (1) if it "operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) if the administrative scheme is so opaque that it becomes incapable of use by the "ordinary prisoner," who cannot "discern or navigate it" or "make sense of what it demands"; or

(3) if prison administrators "thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 643–44.

The DOC's grievance procedure for general matters is set forth in Administrative Directive ("AD") 9.6.[17] *See Riles v. Buchanan*, 656 F. App'x 577, 579–80 (2d Cir. 2016) (describing requirements of AD 9.6). A prisoner must first attempt to resolve the matter informally. He may attempt to verbally resolve the issue with an appropriate staff member or supervisor, but if his attempts at verbal resolution are not effective, then the prisoner must make a written attempt using a specific form and send that form to the appropriate staff member. *See* AD 9.6(6)(A).

If the response is unsatisfactory or if there is no response within 15 business days, the second stage of the AD 9.6 procedure is for prisoners to file a formal Level 1 grievance on an Inmate Administrative Remedy Form within 30 calendar days of the incident that gave rise to the grievance. *Id.* at 9.6(6)(A), (C). An official must respond within 30 business days of receipt of the Level 1 grievance. *Id.* at 9.6(6)(I).

The third stage is the filing of a Level 2 grievance on an Inmate Grievance Appeal Form, CN 9604, to the District Administrator within 5 calendar days of receiving the unsatisfactory disposition or after no response. *Id.* at 9.6(6)(D), (I), and (K). An official must respond within 30 business days of receipt of the Level 2 grievance. *Id.* at 9.6(6)(K). Under certain circumstances, a prisoner may within 5 calendar days of receipt of that disposition file a Level 3 grievance. *Id.* at 9.6(6)(L).

---

[17] Defendants filed a copy of the version of AD 9.6 that was in effect at the time of the events alleged in Gómez's complaint. *See* Doc. #26. Because AD 9.6 has since been updated, *see* Connecticut State Department of Correction, Administrative Directive Chapter 9.6 Inmate Administrative Remedies, *available at* https://portal.ct.gov/-/media/DOC/Pdf/Ad/ad0906pdf.pdf (last accessed March 9, 2022) (noting that it supersedes the version dated August 15, 2013), I will cite to the version of AD 9.6 that defendants attached as an exhibit.

The defendants aver the following three facts in support of their motion for summary judgment: (1) Gómez did not file any administrative grievances while incarcerated at Carl Robinson between March 25 and April 5, 2020;[18] (2) he did file a number of administrative grievances concerning various issues while incarcerated at Northern from April 5, 2020 onward;[19] but (3) none of the administrative grievances filed at Northern concerned the same issues Gómez now raises in his federal lawsuit.[20] In support of those averments, the defendants submitted declarations by keepers of administrative grievance records at both Carl Robinson and Northern as well as copies of all the grievances Gómez filed at Northern from April 5 to December 11, 2020—several months after he filed this action.[21]

In response, Gómez argues that he exhausted administrative remedies when, on three occasions between March 31 and April 5, 2020, he "expressed his grievance 'verbally' to Warden Caron and to other defendants about the staff not wearing PPE which put his health at risk," and also when he "complained about his grievances to the local news."[22] He also "[d]enie[s] in part" the defendants' assertion that his grievances at Northern did not concern the issues raised in his federal lawsuit,[23] although it is unclear from Gómez's submissions what aspect of that claim he disputes. Instead of explaining how his grievances at Northern were sufficient, he merely reiterates his claim that he "verbalized his grievances to Warden Caron and the other named defendants about their failure to use PPE in the correctional facility, and . . . was physically abused for that speech . . . [t]his was retaliation."[24]

---

[18] Doc. #25-3 at 1 (¶ 1); Doc. #25-6 at 2 (¶ 6).

[19] Doc. #25-3 at 1 (¶ 2); Doc. #25-7 at 1 (¶ 5).

[20] Doc. #25-3 at 1 (¶ 3).

[21] Because completion of the exhaustion process *after* a federal action has been filed does not satisfy the exhaustion requirement, *see Neal v. Goord*, 267 F.3d 116, 122 (2d Cir. 2001), *overruled on other grounds*, *Porter*, 534 U.S. 516, any grievances filed at Northern after July 10, 2020, are irrelevant to my exhaustion analysis.

[22] Doc. #29 at 1–2.

[23] *Ibid*.

[24] *Ibid*.

After reviewing the evidence submitted by both parties, I agree with the defendants that Gómez did not properly exhaust his available prison administrative remedies with respect to either his First Amendment retaliation claim against Warden Caron or his Eighth Amendment excessive force claims against Officer Guertin, Officer Quiron, Lieutenant Ouellette, and Lieutenant Kitt. As an initial matter, it is not enough that Gómez "verbalized" his grievances to Warden Caron and the other named defendants while at Carl Robinson. "[I]t is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Jones v. Bock*, 549 U.S. 199, 218 (2007). Informal efforts to put prison officials on notice of inmate concerns do not satisfy the exhaustion requirement. *See Macias v. Zenk*, 495 F.3d 37, 44 (2d Cir. 2007).

Although AD 9.6 provides that a prisoner may *initiate* the grievance process with a verbal complaint, *id.* at 9.6(6)(A), it also provides that the prisoner "shall submit a written request via CN 9601, Inmate Request Form" in the event that "the verbal option does not resolve the issue." *Ibid*. Because he did not continue to pursue his verbal complaints with written grievances according to the DOC's grievance procedure, Gómez's verbal complaints alone were insufficient to exhaust his administrative remedies.

Nor do the grievances filed at Northern suffice. Of the grievances Gómez filed, just one shared any substantive overlap with the events at issue in this action. Specifically, on May 2, 2020, Gómez filed a Level-1 Grievance in which he complained that on April 5, 2020, Warden Caron unfairly recommended that he be placed in administrative segregation and transferred to Northern. According to Gómez, Warden Caron's recommendation was "ethically incorrect" because it was based on the false premise that he had either assaulted prison staff or other

inmates or started or participated in a riot.[25] By way of relief, he requested that the disciplinary report filed against him at Carl Robinson be dismissed or deferred, and he further requested that he be immediately transferred out of Northern.[26] After his Level 1 grievance was denied, Gómez appealed that decision with a Level-2 grievance, which was also denied.[27]

Although apparently procedurally compliant, Gómez's Level 1 grievance of May 2, 2020, was insufficient to "alert[] the prison to the nature of the wrong" for which Gómez now seeks redress. *See Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir. 2004). Notably, neither his Level 1 grievance nor his subsequent Level 2 appeal made any mention of Officer Guertin, Officer Quiron, Lieutenant Ouellette, Lieutenant Kitt, or any other prison staff using excessive force against him.

Additionally, neither the grievance nor the appeal made any mention of his prior complaints about Carl Robinson staff's refusal to wear PPE. While the grievance did call Warden Caron's administrative segregation recommendation "ethically incorrect," it did not in any way suggest that Warden Caron's recommendation was the product of an intent to retaliate against Gómez for complaining about the failure of staff to wear PPE.

The Second Circuit has ruled that such a grievance that fails to identify a prison official's retaliatory reason for an adverse action is not adequate to satisfy the PLRA with respect to a court action alleging a claim for First Amendment retaliation. *See Munger v. Cahill*, 792 F. App'x 110, 112 (2d Cir. 2020) ("But Munger did not specify that his medication was taken away

---

[25] Doc. #25-8 at 1–2.

[26] *Id.* at 2.

[27] *Ibid.* In addition to the Level 1 and Level 2 grievances concerning Warden Caron's administrative segregation recommendation, Gómez filed two unrelated Level 1 Grievances, both on May 10, 2020. The first complained that non-party officers at Northern had retaliated against him by placing him in four-point restraints for a prolonged period of time on April 19, 2020, *see* Doc. #25-8 at 9, and the second complained that non-party officers at Northern had denied him a haircut on May 2, 2020, *see id.* at 11–12. In addition, on June 3, 2020, Gómez filed an appeal of the final decision by a non-party prison official to place him in administrative segregation. *See id.* at 6–7.

because of a lie a nurse told in retaliation against him for an earlier complaint . . . [b]ecause
Munger's grievances did not mention retaliation, Appellees were not on notice of Munger's
complaint of retaliation by Nurse White."); *Baltas v. Rivera*, 2020 WL 6199821 at *10 (D. Conn.
2020) (none of plaintiff's prior grievances had "alerted prison officials that the plaintiff was
complaining that [defendants] had taken some action against him . . . because he had previously
filed a grievance or engaged in other First Amendment-protected activity . . . [a]ccordingly, the
plaintiff has failed to exhaust his First Amendment retaliation claim"); *accord Shifflett v.
Korszniak*, 934 F.3d 356, 366 (3d Cir. 2019) ("Retaliation is a separate claim, and therefore must
be separately grieved.").

Finally, Gómez does not advance any argument to suggest that administrative remedies
were unavailable to him. Although a failure to exhaust may sometimes be excused due to prison
officials' intimidation or threats of retaliation, *see Ross*, 578 U.S. at 644 & n.3, Gómez's
allegation of past retaliation by officials at Carl Robinson does not raise an inference that similar
acts of retaliation will continue to occur at Northern. In any case, the fact that he *has* filed several
grievances at Northern strongly suggests that the grievance process is not "unavailable" to him.
*See McNab v. Doe*, 686 F. App'x 49, 51 (2d Cir. 2017) (intimidation does not excuse exhaustion
where the plaintiff succeeds in actually filing a grievance).

In sum, I conclude that there is no genuine dispute of fact that Gómez failed to exhaust
his administrative remedies as required under the PLRA. His verbal grievances to officials at
Carl Robinson do not suffice for exhaustion purposes because he failed to comply with the DOC
grievance procedure, and his grievances at Northern—while apparently procedurally
compliant—are insufficient because he did not give prison officials substantive notice of the
nature of his claims. Moreover, there is nothing in the record to suggest that administrative

remedies were unavailable to him. Accordingly, I will grant the defendants' motion for summary judgment.

### CONCLUSION

For the reasons set forth above, the Court GRANTS the defendants' motion for summary judgment (Doc. #25). The Clerk of the Court shall close this case.

It is so ordered.

Dated at New Haven this 15th day of March 2022.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge

11